697 P.2d 331

**STATE of Arizona, Appellee,**

v.

**Gary Lynn BURTON, Appellant.**

No. 6135.

Supreme Court of Arizona,
En Banc.

March 26, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Linda A. Akers and Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

Bruce A. Burke, Tucson, for appellant.

HAYS, Justice.

A jury found appellant, Gary Lynn Burton, guilty of armed robbery and aggravated assault. Burton had been previously convicted of four other felonies: attempted second-degree burglary, grand theft, and robbery two times. Appellant was on parole at the time the present offenses were committed. He was sentenced to two terms of life imprisonment pursuant to A.R.S. § 13–604.01(A) (offenses committed while released from confinement) and appealed. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031 (right of appeal). We affirm.

Appellant raises three issues on appeal:

 I. Did the state's presentation of evidence from an unduly suggestive photographic lineup violate the trial judge's order or constitute fundamental error?

 II. Was there sufficient evidence to support the appellant's conviction?

 III. Are appellant's sentences to be served consecutively or concurrently?

FACTS

On the evening of May 31, 1983 a Revco drugstore in Tucson was robbed. Initially, the robber entered the store, purchased a package of Clorets mints, and departed. About 10 to 15 minutes later, when the store was less crowded, the same man returned. This time he selected a package of Clorets gum and brought it to the counter. The clerk, Maria Saucedo, jokingly remarked to the man that he had just purchased some breath mints. The man replied that the gum was for a friend. As Saucedo was about to give him his change, the man demanded money. Saucedo asked him if he was joking. The man drew a .44- or .45-caliber pistol and pointed it at Saucedo. He told her that he knew how to use the weapon but would prefer not to hurt her. Saucedo handed over a sum of money which the robber stuffed into his pants pocket. He then fled from the store, leaving the package of Clorets gum on the counter. The store manager called the police.

Saucedo told the police that the robber was an attractive 25- to 28-year old male, weighing between 155 to 175 pounds and that he was 5'10" to 5'11" tall with straight, shoulder-length blond hair, a beard and mustache. The police made a composite likeness from this description. Three fingerprints were lifted off the package of Clorets gum that was left on the counter. These fingerprints were later identified as belonging to appellant. The composite resembled Burton's driver's license photograph.

On June 25, 1983 the police arrested Burton. He was living at his mother's home, located approximately four blocks from the drugstore. At the time of his arrest, appellant resembled the description Saucedo gave the police, except that he no longer had a beard.

On June 28, 1983, Detective James Gerretti showed Saucedo a photographic lineup. The lineup consisted of photographs of six males, all closely resembling the description Saucedo gave the police. Burton, without a beard, appeared in photograph # 3.

Saucedo was unable to identify the robber from the lineup. She told Detective Gerretti that the robber had brown eyes; all the men in the lineup, however, including Burton, had blue eyes. Gerretti asked her to take a second look at the photographs, disregarding eye color. Saucedo was still unable to identify any of the men as the robber. At this point, Gerretti told Saucedo that fingerprints from the individual depicted in photograph # 3 were found on the package of gum left by the robber. Saucedo then commented that the men in photographs # 3 and # 5 looked familiar. She stated, however, that she was unable to say that either of these men was the robber.

At trial, Burton's counsel argued that although his client's fingerprints were found on the package of gum, Burton was not involved in the robbery.

### THE PHOTOGRAPHIC LINEUP

Before trial, appellant's counsel moved to suppress any in-court identification of appellant. *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), supplemented by 104 Ariz. 439, 454 P.2d 981 (1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). He argued that Gerretti predisposed Saucedo to believe Burton was the robber by telling her that appellant's fingerprints were found on the gum package. Appellant argued, therefore, that all of Saucedo's testimony, including her in-court identification, should have been suppressed. The prosecution conceded that the lineup procedure was tainted and agreed that any in-court identification could be suppressed but disputed that Saucedo's testimony should be excluded in its entirety.

The trial judge precluded the state from eliciting an in-court identification, but her order was unclear as to whether the state could elicit testimony concerning the unsuccessful lineup and Saucedo's reactions to it.

During trial, no in-court identification of Burton occurred. The state, however, questioned both Detective Gerretti and Saucedo about the lineup. Neither the trial judge nor appellant's counsel objected during this questioning. Absent fundamental error, objection for the first time on appeal is generally waived. *State v. Routhier*, 137 Ariz. 90, 95, 669 P.2d 68, 73 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984). However, where a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial. *State v. Lujan*, 136 Ariz. 326, 328, 666 P.2d 71, 73 (1983).

Appellant contends that the prosecution willfully violated the trial judge's order by adducing testimony about the lineup and that this constituted fundamental error. We disagree.

The trial judge's order, limiting questioning of witnesses about the lineup, was unclear. During the pretrial hearing the trial judge stated:

THE COURT: So I won't grant the motion in limited fashion. It is ordered that the victim not be permitted or—be precluded from any in-court identification of the defendant.

The victim may testify about other matters concerning the alleged offense, and she may testify—and she may—and she may also testify as to matters that she told the police or the investigating officers immediately after the alleged offense took place, and before there were any—

MS. HANNAH: Your Honor, I think they could use her statement that she made, but she can [sic] sit in the courtroom and look at my client and start describing him.

THE COURT: No. She can testify to anything she made a statement to. I think she can testify to in open court. I don't think the state is limited to using out of court things she said. I think she can testify in court. The only thing she cannot testify to is— would be to identify him in open court; and if in fact she makes different statements in court from the one she made in the police department, I think you may have some impeachment testimony there.

Did I complete the last sentence?

And before she was shown a photographic lineup. Any statements that she made before she was shown a photographic lineup, she can be questioned about.

Neither in this oral ruling nor in the corresponding minute entry did the trial judge address the specific issue of whether the state could question Saucedo or Gerretti about the lineup. The ruling, however, seems to go both directions. For example, Saucedo was shown the photographic lineup at the police department. Arguably, the court's ruling allowed the introduction of statements made "in the police department." Similarly, the trial judge said, "She can testify to anything she made a statement to." "The only thing she cannot testify to is—would be to identify him in open court; ..." Because of these potential ambiguities, we decline to hold that the prosecution willfully violated the trial judge's order.

Appellant contends that he was denied his constitutional right to due process and a fair trial when this lineup evidence was admitted. U.S. Const. amend. XIV, § 1. According to appellant, its admission was fundamental error.

 Fundamental error is error that goes to the foundation of the case or takes from the defendant a right essential to his defense. *State v. Wussler*, 139 Ariz. 428, 430, 679 P.2d 74, 76 (1984). Constitutional error is one form of fundamental error. When constitutional error occurs, an appellate court must determine, beyond a reasonable doubt, whether the error influenced the jury's verdict. *State v. Montes*, 136 Ariz. 491, 497, 667 P.2d 191, 193 (1983). "The question is whether the appellate court can say beyond a reasonable doubt that the jury would have found the defendant guilty without the evidence." *Id.*

Assuming without deciding that admission of the lineup testimony was constitutional error, *cf. Neil v. Biggers*, 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401, 410–11 (1972); *Gilbert v. California, supra*, 388 U.S. at 272–73, 87 S.Ct. at 1956–57, 18 L.Ed.2d at 1186–87 (1967), we hold that its admission was harmless and did not contribute to the jury's guilty verdict.

The testimony about the photographic lineup tended to exonerate the appellant. Detective Gerretti testified:

A. She looked at it [the photographic lineup] for approximately 45 seconds, and she indicated to me that no one in the photographic lineup was the person who robbed her.

I then asked her if she was sure. She stated, yes, she was sure because no one in the lineup had brown eyes. I then asked her to forget about the eye coloring, and just look at faces, and to view the lineup one more time. She looked at the lineup for several— well, 10 to 15 seconds again, and one time she indicated to me that no one in that lineup was the person who robbed her.

Q. Did she indicate to you whether any of those individuals looked familiar?

A. After she indicated to me that no one in that lineup had robbed her, I indicated to her that the person occupying space number 3 was the individual's fingerprints [sic] that were found were found on the package of gum that were left behind. At which time she told me that 3 and 5 looked familiar to her, but she couldn't say that they were the individual that robbed her.

Maria Saucedo testified:

A. Okay. I went up and he [Gerretti] took me into a room. He had me read

a statement saying that the person could have changed his face or, you know, shaved—like shaved off the beard or something and just to let me know that he could have changed his—his facial looks. Okay?

He showed me the photographs of six men. I looked at 'em for about maybe three to five minutes, and I told him I couldn't tell which one it was because I didn't want to identify the wrong person.

I had two of them in mind. I had number 3 and 5. I thought I had seen both of them, but since I wasn't sure, I didn't say which one; and then he told me which one it was. That's when I told him which one I thought it was, the two that I thought.

Q. He indicated to you which one he thought it was?

A. No, he told me which one it was. Okay. Which person it was in the lineup.

Q. Do you recall who or what number that was?

A. Number 3.

Q. And what did you tell him?

A. I told him that I wasn't sure between number 3 and number 5. That's how come I didn't say anything.

Both Gerretti and Saucedo's testimony indicated that Saucedo was not sure that appellant was the robber.

We believe that appellant was aware that this testimony tended to benefit him. During appellant's cross-examination of Gerretti, appellant unsuccessfully tried to get Gerretti's police report into evidence. Before trial, when appellant discovered that Gerretti was ill and unavailable to testify at trial, appellant moved to continue the trial date. During oral argument, the state pointed out that appellant had subpoenaed Gerretti for trial and required him to bring the photographic lineup during his appearance. These facts indicate to us that appellant believed that the evidence surrounding the photographic lineup benefited him.

Similarly, we conclude that appellant's failure to object when this testimony was admitted into evidence, was a tactical decision. Appellant may not invite error at trial and then assign the same as error on appeal. *State v. Islas*, 132 Ariz. 590, 592, 647 P.2d 1188, 1190 (App.1982).

The testimony concerning the photographic lineup tended to exonerate appellant. We believe that the jury would have found appellant guilty without the admission of this evidence. We find that the error, if any, did not contribute to the jury's verdict. We hold, therefore, that even if its admission was error, it was harmless beyond a reasonable doubt.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends that he was entitled to a directed verdict because the state did not produce evidence sufficient to support his conviction. According to appellant, the only probative evidence linking him to the robbery were the fingerprints on the package of gum left at the scene by the robber. Appellant maintains that this evidence, without more, is insufficient.

In reviewing a conviction challenged for insufficiency of evidence, the relevant question for an appellate court is whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979). The conviction may be proved by circumstantial evidence alone. *State v. Brady*, 2 Ariz.App. 210, 213, 407 P.2d 399, 402 (1965). Fingerprints are direct evidence and their presence alone can be sufficient to prove guilt beyond a reasonable doubt. *Id.*

Appellant argues that since his fingerprints were found on an object in public display, this negates any probative value. Appellant cites *Moon v. State*, 22 Ariz. 418, 198 P. 288 (1921), in support of this proposition. In *Moon*, the court indicated by implication that if fingerprints are found in a

public place, under circumstances that do not permit the inference that they were placed there during the crime, their presence alone is insufficient to support a conviction. *Id.* at 425–26, 198 P. at 291.

In this case, the robber handed the package of Clorets gum to the salesclerk, Maria Saucedo. As she prepared to make change, the robber drew a pistol, took some money and fled. The robber left the package of Clorets on the counter. Saucedo picked up the package and placed it on the top of her cash register. The package remained on the top of the cash register until the police arrived and checked it for fingerprints. The three fingerprints found on the package belonged to the appellant.

Saucedo gave the police officers a description of the robber and assisted in making a composite likeness. This likeness resembled appellant's driver's license photograph, and Saucedo's description generally matched the appellant. Appellant's brother testified that appellant shaved about the time of the robbery. This is consistent with the prosecution's theory that appellant wished to change his appearance.

Taking these facts as a whole, we believe that a rational jury could have found appellant guilty beyond a reasonable doubt. We hold that the evidence was sufficient to support appellant's conviction.

## SENTENCING

Pursuant to A.R.S. § 13–604.01(A), appellant was sentenced to two life terms. The trial court, however, was unclear as to whether these terms were to be served consecutively or concurrently.

At the sentencing hearing, the trial judge stated that appellant's two life sentences were to be served consecutively. Later in the transcript, the trial judge stated: "You should get credit for all time you've served so far, which is 133 days in jail since your arrest. It's not much when stacked against 25 years." A.R.S. § 13–604.01(A) prescribes a life sentence without possibility of parole for 25 years. If appellant's two life sentences were to be served con-

secutively, then he would not be eligible for parole for 50 years. Similarly, A.R.S. § 13–708 (concurrent terms of imprisonment) requires a sentencing court to set forth its reasons if it elects to impose consecutive sentences. The trial judge set forth no such reasons. Furthermore, the trial judge's minute entry indicates that the life sentence imposed with respect to Count I would be served concurrent to the life sentence imposed in Count II.

Pursuant to A.R.S. § 13–4037 (power of supreme court to correct and reduce sentence upon appeal by defendant), we order that appellant's sentences are to run concurrently. Appellant is to be credited with the time he served while awaiting trial: 133 days against Count I and 133 days against Count II. *State v. Cruz-Mata,* 138 Ariz. 370, 374–76, 674 P.2d 1368, 1372–74 (1983).

We have reviewed the record for fundamental error, pursuant to A.R.S. § 13–4035, and have found none. Accordingly, we affirm the judgments of conviction, with modification of sentences as specified.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

FELDMAN, Justice, specially concurring.

I cannot agree that the erroneous admission of testimony regarding a photographic line-up, in direct defiance of a trial judge's ruling on the issue, can be "harmless error." I concur in the result, however, because I believe that the confusing record before us indicates that the testimony regarding the photographic line-up was admitted at defendant's behest rather than over his objection.

It is rational to conclude that *defendant* proposed to offer evidence that the victim could not identify his picture in the photographic line-up prepared by police officers. Such evidence tended to exculpate defendant by rebutting the inculpatory evidence such as fingerprints, the victim's description and the composite which matched defendant's driver's license photograph. Trial counsel should have been concerned that

the jury might convict defendant on the circumstantial evidence, notwithstanding the absence of direct eyewitness identification. Demonstrating the victim's inability to make that identification certainly would have been acceptable trial strategy. If the defendant proposed to offer such evidence, then the state could properly attempt to draw the sting, as I think it did here, by presenting the testimony during direct examination in its case in chief. If, in fact, this is what happened at trial, then we have an adequate explanation for the failure of defense counsel to object, move for mistrial, or take any one of a number of other appropriate steps during and after the trial. It explains why the trial judge did not stop the prosecutor as he violated her order.

The conclusion that this did occur is compelled by several other factors from the record. First, it was the defendant that subpoenaed the officer who had handled the photographic line-up (Gerretti) for trial. Next, it was defendant that subpoenaed the photographs. Then, when Gerretti was unavailable to testify at trial, defendant moved for a continuance in order to procure his testimony. Finally, defendant unsuccessfully attempted to offer in evidence Gerretti's police report, which describes, in detail, the victim's inability to identify defendant.

I conclude from this record, therefore, that the admission of Gerretti's testimony regarding the photographic line-up was the result of defendant's trial strategy and was not error. Thus, I concur in the result.